Filed 6/12/26

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063674 |
| v. | (Super. Ct. No. 12CF0990) |
| KEVIN MICHAEL KONTHER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

---

* Certified for publication, with the exception of part I, subsection E, and part II, subsection B. (Cal. Rules of Court, rules 8.1105(b) & 8.1110.)

In 1995, Kevin Michael Konther raped a nine-year-old girl. In 1998, he raped a 21-year-old woman. Police obtained matching DNA evidence from both victims, but the crimes went unsolved for many years. In 2018, using investigative genetic genealogy (IGG), which combines DNA analysis with genealogical research, police identified either Konther, or his identical twin brother S.K., as the suspect in both sexual assaults.

Police detained Konther and S.K., put them together, then secretly recorded their conversations. Konther made several incriminating statements as to the two rapes. Konther also alluded to committing other uncharged assaults. During the investigation, police discovered Konther had also committed a lewd act against his girlfriend's daughter.

A jury convicted Konther of two counts of forcible rape, lewd conduct with a child, other sex offenses, and found true related "One Strike" allegations. The trial court imposed a sentence of 140 years to life.

Konther claims the trial court erred in denying his pretrial motion to suppress evidence based on the warrantless search of his DNA using IGG. We disagree. A Fourth Amendment "search" occurs when the government intrudes into an area where a person has a reasonable expectation of privacy. (*Katz v. United States* (1967) 389 U.S. 347, 350 (*Katz*).) However, a person has no reasonable expectation of privacy in abandoned property. (*People v. Parson* (2008) 44 Cal.4th 332, 345 (*Parson*).)

In the published portion of this opinion, we agree with trial court and hold that a defendant has no "reasonable expectation of privacy for a semen sample left at a crime scene during the commission of a crime."

In the unpublished portion of this opinion, Konther claims the trial court improperly admitted his statements about committing other uncharged assaults. But we need not address the merits of this claim because

2

even if we were to assume that the court committed an evidentiary error, we would find the error harmless beyond a reasonable doubt.

Thus, we affirm the judgment.

## I.

## FACTS AND PROCEDURAL BACKGROUND

In 1995, Konther, who was then 30 years old, raped Jackie C. (Jackie) who was then nine years old. In 1998, he raped Lucia M. (Lucia) who was then 21 years old. Police recovered matching DNA evidence from both victims. In 2018, after identifying Konther as a suspect, police learned Konther had committed a lewd act against his girlfriend's daughter Brittney E. (Brittney) when she was 10 years old (from April 1999 to April 2000).

### A. Victim Jackie

In October 1995, late in the afternoon, Jackie was walking from a shopping center to her family home in Lake Forest. As she was walking next to a park, a man with shoulder left length hair came up behind her and grabbed her. The man put his hands over Jackie's mouth, said that he had a knife, and led her down into a wooded area of the park. The man told Jackie to take her clothes off. Jackie was terrified, begged him not to hurt her, and said, "'Please, I'm only nine.'"

At the bottom of an embankment, the man made Jackie orally copulate him. The man then ripped off Jackie's underwear and forcibly penetrated her vagina with his penis. At the end of the incident, Jackie ran home and her mother called police. Jackie was taken to the hospital where a sexual assault examination was performed. DNA was extracted from spermatozoa found in vaginal samples collected during the examination.

3

*B. Victim Lucia*

On June 2, 1998, in the mid-morning, Lucia was jogging along a hiking trail in Lake Forest. A man with shoulder length hair came up from behind Lucia, put his arm around her neck, and dragged her down a hill to a wooded area. The man pulled Lucia's clothes off, and forcibly penetrated her vagina with his penis. The man orally copulated her vagina and anus.

After the man left, Lucia was able to climb up the hill and wave down a car and the driver called police. Lucia was taken to a hospital where a sexual assault examination was performed. DNA was extracted from spermatozoa found in samples collected during the examination. The DNA sample was uploaded to the laboratory's database and was found to be a match with the 1995 sample taken from Jackie.

*C. Victim Brittney*

When Brittney was about four years old, Konther began dating her mother Tammy. Konther eventually moved in with Tammy, who later gave birth to two other girls. Starting when Brittney was about eight years old, and continuing until she was about 11 years old, Konther routinely stood next to Brittney's bed while he was naked as Brittney pretend to be asleep. On one occasion when she was about 10 years old, in a home in Huntington Beach, Konther had Brittney sleep with him. Konther tickled Brittney's buttocks even after she told him to stop.

In 2003, when Brittney was about 12 years old, she saw Konther peering at her through a window while she was taking a bath. Brittney told a relative, and was later interviewed by a Child Protective Services (CPS) social worker, but no action was taken.

*D. Police Investigation*

In August 2018, police were investigating the unsolved (cold) sexual assault cases involving Jackie and Lucia. Using IGG, police identified identical twins Konther and S.K. as suspects. During the relevant time frames, photos showed Konther wore his hair long, while S.K. wore his hair short. Police searched trash cans located at the homes of Konther and S.K., collected DNA evidence, and determined that their DNA was a match with the DNA collected from the 1995 and 1998 sexual assaults. The identical twins shared the same DNA.[1]

In December 2018, police met with Konther and he agreed to provide a buccal swab. In a ruse, police told Konther that he had left some DNA on Brittney. At this point, police had already conducted a background investigation of Konther and had discovered the 2003 CPS report.

On January 10, 2019, police separately detained S.K. and Konther. They were each told that charges had been filed involving forcible sex acts committed in 1995 and 1998. Police then placed the brothers together in transportation vehicles, and later at the Huntington Beach jail. During each encounter their conversations were secretly recorded. Konther made numerous statements implicating himself in the 1995 and 1998 sexual assaults, as well as the lewd act committed against Brittney. Konther also alluded to committing other uncharged assaults.

---

[1] Apparently there are some laboratories that may be able to differentiate between the DNA of identical twins if there are mutations; however, such testing was not performed in this case.

*E. Recorded Conversations*[2]

S.K. speculated that Brittney's mother Tammy had falsely accused them and caused their arrest. Konther responded, "It's the DNA, dude. It's the DNA." Konther said he was sorry. S.K. complained about the unfairness of their confinement; Konther responded, "It's my fault." Konther repeated the word "DNA" and continued to repeatedly tell S.K. he was sorry. S.K. again blamed Tammy, but Konther said, "It's what I did." Konther said, "Knew this was going to happen. That's why I told you, take my car. Take my house. Take everything please." S.K. responded that it was all the result of a bunch of lies from Tammy. Konther said, "It's all my fault. I tried to be a good person for twenty years. I've tried. I've made my mistakes. I've tried to be good." Later, S.K. asked, "And why am I being detained? For what?" Konther replied, "We have the same DNA; I don't know."

S.K. again blamed Tammy for the arrest; however, Konther said, "I ruined your life." When S.K. asked, "Huh?" Konther repeated, "I ruined it." S.K. said, "No you didn't," but Konther insisted, "My thing. My fault. My fault." Konther said that he was worried, "Cause I'm going away." When S.K. rejected this assertion and said that it did not make any sense, Konther replied, "Statute of limitations, and . . . BRITTNEY's a minor . . . ."

S.K. complained that someone could not just go to a cop and lie, to which Konther responded, "It's DNA." Konther said how sorry he was that he "did this to you guys" and he was "so sorry [he] got everyone involved." Konther again told S.K., "I'm so sorry I did this to you." Konther continued to apologize, and he again acknowledged, "I can't believe I got you into this" and

---

[2] We have summarized the lengthy recordings, and in some cases we have included direct quotes and portions of transcriptions. Grammatical errors have been left in place.

"it's all my fault."

After being moved to a different vehicle, S.K. continued to blame Tammy and the girls for causing their arrests. Konther replied, "No, they didn't." S.K. repeated that Tammy was to blame, but Konther said, "It's not her fault. It's not her fault." Later, Konther said, "It's me . . . I'm losing my business," and "I'm not coming back." As S.K. complained about government abuses of regular citizens, Konther said, "Because of me. Because of me. Okay. I was stupid." Konther said that he anticipated that he might go away for "20 something years."

Konther said, "It's my past, it caught up to me." Konther said that his mother would be "devasted" and that his father would "die." S.K. again suggested Tammy was to blame, but Konther said, "I did this to dad. They didn't do this to dad. I was in the wrong." Konther worried he would never "see the outside." He acknowledged, "It's the charges, sexual assault because they're underage. That's the problem." Later, Konther said, "I knew this was going to happen. I should've just . . . turned myself in."

Konther said, "It's my . . . bad past caught up to me because of Tammy. My stupidity. My wrongdoings. My chemical imbalance in my brain. I've been fighting that demon for a long time. I just hate women, that's my problem. I just f*cking hate her." S.K. suggested that Konther could pay for his crimes by paying a fine, but Konther told him, "it's a bad crime." Konther asked S.K. if would take care of his cats.

S.K. again repeated that someone must have lied, but Konther said, "No." Konther acknowledged, "It's a 100 percent me," and he continued to repeat this statement. As Konther continued to apologize, S.K. said, "It's not you," but Konther replied, "It is me." As they approached Huntington Beach, Konther said, "I sure hope it has to do with . . . Brittney and nobody

else. But I don't think so. That's why I'm afraid." When S.K. asked why they were going to Huntington Beach, Konther said it was because that is where the "Brittney incident" occurred.

The transport van took them to the sally port of the Huntington Beach jail. As they waited on a bench together, the two brothers had the following conversation:[3]

"[S.K.]: How can this happen to me? I didn't do anything wrong.

"[KONTHER]: 'Cause your DNA is my DNA.

"[S.K.]: Yeah.

"[KONTHER]: And, I hope that, I hope the DNA is just Brittney and that this case doesn't go into other people because, I swear there are some other, other assaults.

"[S.K.]: Assault. More than one?

"[KONTHER]: Yeah.

"[S.K.]: How many?

"[KONTHER]: *** I told you*** how many*** Lake Forest, One in Lake Forest***.

"[S.K.]: In the forest?

"[KONTHER]: Yeah, and then there was the other . . . there was another one; the *** just, I don't know why my brain is,*** f*ck***.

"[S.K.]: Another one, when? . . . I don't give a sh*t.

---

[3] *** Denotes unintelligible conversation; . . . Denotes pauses between words, but does not denote missing words. The name Darryl B. in the transcript refers to a former classmate of Konther who lived about a mile from the location of Lucia's rape. Konther's parents lived in Lake Forest and Konther listed that address on his DMV records. A breezeway connected their neighborhood to the park where Jackie was raped.

"[KONTHER]: Lake Forest

"[S.K.]: In Lake Forest?

"[KONTHER]: Yeah.

"[S.K.]: In the forest.

"[KONTHER]: One in the forest; one in the, uh, where, uh, Darryl [B.'s], you know, uh . . .

"[S.K.]: Forest, is . . .

"[KONTHER]: Yeah. And kinda up in his old house*** you know uh ***

"[S.K.]: With who?

"[KONTHER]: Just random. I don't know why I did it.

"[S.K.]: Somebody you jumped on?

"[KONTHER]: Yeah.

"[S.K.]: Forced them?

"[KONTHER]: Well I didn't have sex with . . .I had sex with one, I think; but the other one, I did not.

"[S.K.]: But you just scared 'em?

"[KONTHER]: Yeah, and *** there was a 9-year-old *** . . .

"[S.K.]: 9-year-old *** Why'd you do that? ***.

"[KONTHER]: I don't know. I didn't know; I didn't know it was a young person . . . I didn't know. I don't know, man. I don't what the f*ck's*** my problem.

"[S.K.]: And the***? How were they, why were they alone?

"[KONTHER]: I don't know. They were walking home or something. I was just, I don't know why I'm so troubled. Because of Diane. You know, when Diane broke up with me; and, you know, *** when did Diane break up with me –'95 or . . . ?

"[S.K.]: I don't know, something like that.

"[KONTHER]: I was at mom's though, so I had a*** alley . . .

"[S.K.]: What are you walking around at night?

"[KONTHER]: Yeah, just walking around at night. Just . . .

"[S.K.]: At night?

"[KONTHER]: Yeah. I'm really sorry, man. It's just, you know . . .

"[S.K.]: Wait, how did they know they, that** . . . What happened afterward? The 9-year-old ran away or what?

"[KONTHER]: *** Well, yeah *** ran off in the*** saw what was going on*** just scared and just did the wrong thing.

"[S.K.]: How did they . . . How did they see that, that, what was going on?

"[KONTHER]: *** or whatever.

"[S.K.]: At mom's house?

"[KONTHER]: No, no, in the forest area. *** I was already out of there. I was already gone. * * * investigate, and the same thing with the Darryl [B.] one *** investigating *** I don't know * * *

"[S.K.]: Darryl [B.]?

"[KONTHER]: Huh?

"[S.K.]: Darryl [B.] one?

"[KONTHER]: Yeah. There was, you know, I don't know; I don't know what I left behind; I don't know. *** shit man, I'm so stupid. So stupid. I tried 20 years to behave*** anything wrong*** just straighten my head out."

Konther said he regretted not trusting his instinct and not going to Mexico. S.K. told him that Canada would have been better. Konther said, "If I get out, I gotta run." S.K. tried to convince him to stay and fight the

charges, but Konther insisted, ". . . I gotta run." S.K. told him he would have even more problems if he ran, but Konther pointed out that at least he would not be in jail for 20 years. S.K. suggested he would only be facing five years, but Konther insisted, he would be going to jail "for a long time." Later, Konther expressed, "I sure . . . hope it's Brittney ***."

After discussing the weather, Konther told his brother about additional crimes he had committed:

"[S.K.]: I'm not a f*cking criminal!

"[KONTHER]: I am.

"[S.K.]: No, you're not.

"[KONTHER]: Yes, I am.

"[S.K.]: You've done nothing wrong for f*cking twenty years. . . .

"[KONTHER]: I have done nothing wrong, but I am a criminal from my past. I got, I got serious issues *** past, and now I got to pay for it. And I don't want to. And *** OK. Tammy brought this nightmare on me.

"[S.K.]: Yeah, this is who's to blame. Tammy.

"[KONTHER]: *** and my daughter [M.], they all brought this nightmare on me.

"[S.K.]: Yeah. Yeah, they did.

"[KONTHER]: . . . they they don't know what they brought on me. They don't know what they did.

"[S.K.]: Yeah.

"[KONTHER]: They really don't. They think they're just, just mad cops and stuff but they brought something down on me that that that can't be stopped and now they don't know about this. I wonder if they're gonna find out about this. I don't think they will. I don't think they'll find out about this.

"[S.K.]: Oh, they'll find out. I'm gonna f*cking, I'm gonna prosecute them. Big time.

"[KONTHER]: No, I don't think they'll find out about the allegations of the assaults upon other random people.

"[S.K.]: How many, two?

"[KONTHER]: I mean, I don't know.

"[S.K.]: What do you mean, you don't know?

"[KONTHER]: I don't know. Maybe three, four, I don't know.

"[S.K.]: What?

"[KONTHER]: Yeah, 'cause it was a*** or whatever*** I don't know how many people have my face or . . .

"[S.K.]: (UNINTELLIGIBLE)

"[KONTHER]: *** my brain. I got something wrong with my brain, maybe. I'm just mad. I just hate and hate women. At this point man . .

"[S.K.]: How old are they? All of these.

"[KONTHER]: Oh they're old older, older.

"[S.K.]: Much older?

"[KONTHER]: Yeah. The only the only one I'm worried about is the, is the . . .

"[S.K].: In the forest.

"[KONTHER]: . . . 9, the 9-year-old.

"[KONTHER]: Yeah.

"[S.K.]: The other ones are all old?

"[KONTHER]: Yeah.

"[S.K].: And what was it, just . . .

"[KONTHER]: I can just say *** a party and I got drunk and I, and I, . . . you know, whatever, I don't understand, or something like that. I

12

was drunk and I didn't know anything. Drunk, or whatever . . .

"[S.K.]: It was consensual.

"[KONTHER: Yeah.

"[S.K.]: ***

"[KONTHER]: I don't know. I don't know. I'm just scared.

"[S.K.]: Yeah.

"[KONTHER]: I'm really scared.

"[S.K.]: I am too. I'm just mad as hell that this is f*cking happening. This is wrong. This is way wrong.

"[KONTHER]: But you can understand why it is. It's my fault. l brought this. I didn't realize I was gonna bring this to you."

*F. Court Proceedings*

The People filed an information charging Konther with: 1) forcible rape (Jackie); 2) forcible oral copulation (Jackie); 3) forcible lewd act upon a child under 14 (Jackie); 4) forcible rape (Lucia); 5) forcible oral copulation (Lucia); and 6) lewd act upon a child under 14 (Brittney). The information alleged multiple victim allegations as to counts one through six, and kidnapping allegations as to counts one through five.

Prior to a jury trial, Konther filed a motion to suppress evidence, which was denied (the relevant proceedings will be summarized in the discussion section of this opinion). A jury found Konther guilty of the charged crimes and found true the allegations. The court imposed a One Strike sentence of 140 years to life, consisting of 25 years to life as to counts one through five and 15 years to life as to count six.

13

## II.

## DISCUSSION

Konther claims the trial court (A) erred by denying his motion to suppress evidence (Pen. Code, § 1538.5), and (B) erred by allowing the People to introduce evidence of other uncharged crimes (Evid. Code, § 1108).

### A. Motion to Suppress Evidence

Konther claims police violated his Fourth Amendment rights by analyzing his DNA using investigative genetic genealogy (IGG) without first obtaining a search warrant. We disagree. Konther had no reasonable expectation of privacy when he abandoned his semen at two crime scenes.

When reviewing a ruling on a defendant's motion to suppress evidence, appellate courts "'"defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment."'" (*People v. Johnson* (2018) 21 Cal.App.5th 1026, 1031–1032.)

In this discussion we shall: 1) examine relevant legal principles; 2) summarize the trial court proceedings; and 3) analyze the relevant constitutional principles as applied to the undisputed facts.

### 1. Legal Principles

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)

14

Under Penal Code section 1538.5, a trial court may grant a defendant's motion to suppress evidence only if exclusion is required under the Fourth Amendment. (*People v. Banks* (1993) 6 Cal.4th 926, 934.) Ordinarily, the initial burden is on the defendant to establish that the government conducted a "search" without a warrant. If the defendant meets this initial burden, then the burden shifts to the prosecution to justify the warrantless search by proving an exception to the warrant requirement (exigent circumstances, consent, search incident to arrest, plain view, etc.). (*People v. Williams* (1999) 20 Cal.4th 119, 127.)

Under the Fourth Amendment, a "search" is a governmental intrusion into an area where a person has a reasonable expectation of privacy. (*Katz, supra,* 389 U.S. at p. 350.) Consequently, there is no "search" within the meaning of the constitution unless a person had a reasonable expectation of privacy, and that expectation was violated by an unreasonable governmental intrusion. (*Id.* at p. 353.)

The test to be applied in assessing a defendant's claim that he or she had a reasonable expectation of privacy has both subjective and objective components. (*Rakas v. Illinois* (1978) 439 U.S. 128, 147–148.) That is, "'the defendant must show that he or she had a *subjective* expectation of privacy that was *objectively* reasonable.'" (*People v. Ayala* (2000) 23 Cal.4th 225, 255, italics added.) The Fourth Amendment protects only a *reasonable* expectation of privacy, which "by definition means more than a subjective expectation of not being discovered." (*Rakas* at p. 143, fn. 12.)

A criminal defendant's "subjective expectations of privacy that society is not prepared to recognize as legitimate have no [Fourth Amendment] protection." (*People v. Reyes* (1998) 19 Cal.4th 743, 751.) For instance: "A burglar plying his trade in a summer cabin during the off season

15

may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.' [H]is expectation is not 'one that society is prepared to recognize as "reasonable."'" (*Rakas v. Illinois, supra,* 439 U.S. at pp. 143–144, fn. 12.)

Generally, there is no reasonable expectation of privacy in abandoned property. (*Parson, supra,* 44 Cal.4th at p. 345 ["It has long been settled . . . that a warrantless search and seizure involving abandoned property is not unlawful, because a person has no reasonable expectation of privacy in such property"].) "There can be nothing unlawful in the Government's appropriation of such abandoned property." (*Abel v. United States* (1960) 362 U.S. 217, 241; see, e.g., *California v. Greenwood* (1988) 486 U.S. 35, 40–41 [defendants had no reasonable expectation of privacy protected by the Fourth Amendment in garbage which they placed in opaque bags outside their house for collection by trash collector ]; see also *People v. Daggs* (2005) 133 Cal.App.4th 361, 365 [defendant abandoned his cell phone at the scene of the robbery, and therefore no search occurred when the police removed the battery to view numbers identifying the phone].)

"""Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other *objective* facts. [Citations.] Abandonment here is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search."'" (*Parson, supra,* 44 Cal.4th at p 346.) "'The question whether property is abandoned is an issue of fact, and the court's finding must be upheld if supported by substantial evidence.'" (*Ibid.*)

*2. Trial Court Proceedings*

Prior to trial, Konther filed a motion to suppress evidence. He asserted the following anticipated facts in the motion:

In 1998, the Orange County Crime lab determined that the 1995 sexual assault (Jackie) and the 1998 sexual assault (Lucia) were committed by the same offender. At that time, police uploaded the DNA profile to state and national law enforcement databases, including the FBI's Combined DNA Index System (CODIS), but no matches were found.

In August 2018, police sent DNA samples collected at the crime scenes to a private lab that converted the offender's DNA sample into a more detailed single-nucleotide polymorphism (SNP) text file. In September 2018, police then uploaded the SNP file to publicly available genealogical websites, which allow users to upload their DNA data for personal research. The FBI assisted in the investigative genetic genealogy (IGG) investigation and determined that the SNP file matched to Konther's family members living in Lake Forest. The FBI later concluded in a report that the likely offender was either Konther or S.K., who were identical twins. In October 2018, after collecting items from trash, including discarded cigarette butts, police confirmed that Konther and his brother's DNA matched the DNA collected from the 1995 and 1998 sexual assaults.

In his motion to suppress evidence, Konther argued that law enforcement's creation of the SNP file from his genetic material, and the uploading of that SNP file to publicly available genealogical websites, constituted a "search" that implicated his reasonable expectation of privacy under the Fourth Amendment. Konther sought to exclude the forensic testing evidence, and all derivative evidence (the DNA evidence collected from his trash can, his recorded statements to his brother, his DNA evidence collected

17

through a buccal swab, etc.).

The People filed an opposition that did not dispute the facts as alleged in Konther's motion. However, the People asserted Konther did not have "standing" to bring the motion to suppress evidence because he had no reasonable expectation of privacy in his semen left at two crime scenes.[4] The People cited numerous state and federal opinions for the proposition that a defendant has "no reasonable expectation of privacy in abandoned property." (See, e.g., *Parson,* 44 Cal.4th at p. 345.)

Konther filed a reply, conceding "that society is unwilling to recognize an expectation of privacy in semen left at a crime scene." But Konther asserted that the "framing of the issue as whether there is legitimate expectation of privacy *in semen left at the crime scene* conveniently avoids the difficult privacy questions raised in this case and others involving genetic genealogy."

At the hearing on the motion, Konther's counsel reiterated his argument that law enforcement's "creation of the SNP file" was "a search because it implicates a privacy interest." The court asked for a clarification of the term SNP, and the prosecutor explained that the term refers to a single-nucleotide polymorphism, which "gives law enforcement an opportunity to search a greater universe of individuals, not just the typical DNA loci we're used to seeing."

Konther's counsel argued that case law to this point "discusses DNA that is analyzed for purposes of CODIS identification. All of those cases, the rationale of those cases talk about the fact that the DNA analysis is only

---

[4] In search and seizure claims standing "is not a jurisdictional question" but instead is part "of the merits of a Fourth Amendment claim." (*Byrd v. United States* (2018) 584 U.S. 395, 410–411.)

18

looking at certain loci, is only trying to determine a one-to-one match or exclusion. It's like a fingerprint that a suspect leaves at a crime scene that's open to public inspection. Of course, I absolutely agree there is no reasonable expectation of privacy in that information. [¶] What the government did here is they went beyond that." Counsel argued that by creating the SNP file, law enforcement "create[d] a full DNA profile, which instead of 13, 20, 40 loci, which the criminal justice system has been dealing with thus far, now we have hundreds of thousands of [DNA] data points that now is in the possession of the government."

After listening to testimony from a cold case investigator, the trial court denied the motion to suppress. The court said that Konther provided no case law that restricts how law enforcement can "process abandoned property. I just don't see that." The court found that "after considering the points and authorities as well as the argument of counsel," the court "cannot conclude, based on the case law, that there's a reasonable expectation of privacy for a semen sample left at a crime scene during the commission of a crime."

### 3. Application and Analysis

We have found no California published opinions directly on point.[5] However, the Minnesota Supreme Court recently held that "a Fourth Amendment search did not occur when the police had [a private laboratory] perform a genetic analysis of the biological material [defendant] left behind at the crime scene." (*State v. Carbo* (Minn. 2024) 6 N.W.3d 114, 122 (*Carbo*).)

---

[5] It is primarily for this reason that we are certifying this opinion for partial publication. (See Cal. Rules of Court, rule 8.1105(c).)

19

In 1986, police found a strangulated body of a 38-year-old woman in her home. (*Carbo, supra,* 6 N.W.3d at pp. 118–119.) "A vaginal swab detected sperm that had been deposited within the previous 48 hours." (*Id.* at p. 119.) Over 30 years later, police contracted with a private laboratory "to conduct a genetic analysis of DNA preserved from the crime scene." (*Id.* at p. 120.) The lab "utilized commercial genealogical databases to determine the likely source of the profile." (*Ibid.*) The lab's analysis identified defendant as the likely source. Police obtained defendant's DNA from his trash, and confirmed it was a match with the DNA from the crime scene. After being indicted for murder, defendant moved to suppress the lab's DNA analysis. The trial court denied the motion, concluding defendant "had abandoned any privacy interest in his genetic information." (*Ibid.*) On appeal, the Minnesota Supreme Court agreed with the trial court's ruling. (*Id.* at p. 122.)

In *Carbo*, the court stated that a Fourth Amendment "search occurs when the government seeks to gain information by infringing upon a person's 'reasonable expectation of privacy.'" (*Carbo, supra*, 6 N.W.3d. at p. 121.) That is, in order to successfully pursue a motion to suppress, "a defendant must show that he had an 'actual subjective expectation of privacy' in the object searched and that his 'expectation [was] reasonable.'" (*Ibid.*) The *Carbo* court noted that it is well-settled that a defendant's "subjective expectation of privacy is usually lost when an object is abandoned." (*Ibid.*) In *Carbo*, the court held defendant's actions of having unprotected sex indicated that he had abandoned any subjective expectation in his genetic information by voluntarily leaving his semen at the crime scene. (*Id.* at pp. 121–122.)

We agree with the Minnesota Supreme Court. In this case, Konther had unprotected sex when he raped Jackie in 1995, and when he raped Lucia in 1998. As in *Carbo*, Konther's actions reasonably indicate that

20

he had no expectation of privacy in the genetic information or DNA contained in his ejaculated semen. (See *People v. Ayala*, *supra*, 23 Cal.4th at p. 255 ["'the defendant must show that he or she had a subjective expectation of privacy"].) In other words, there is substantial evidence to support the trial court's factual finding that Konther abandoned his property and """"that he no longer retained a reasonable expectation of privacy in it at the time of the search.""" (*Parson, supra,* 44 Cal.4th at p. 346 ["'The question whether property is abandoned is an issue of fact, and the court's finding must be upheld if supported by substantial evidence'"].)

Our analysis is indirectly supported by at least one California appellate court opinion, which held that the abandonment doctrine applies in the context of DNA evidence. (See *People v. Gallego* (2010) 190 Cal.App.4th 388, 393, 398 (*Gallego*).) In *Gallego*, police collected a cigarette butt defendant tossed onto a sidewalk and tested it for DNA. The court concluded that the test did not constitute a search because defendant could claim no privacy interest in the cigarette butt he had voluntarily and consciously abandoned in a public place. (*Id.* at p. 395.) The court analogized the facts with those in *California v. Greenwood*, *supra*, 486 U.S. at pp. 40–41, where the United States Supreme Court found no reasonable expectation of privacy in garbage bags containing evidence of drug trafficking because the bags had been left at the curb for garbage collection. (*Gallego,* at pp. 395–396.)

Our analysis is further supported by a multitude of out-of-state cases that similarly hold that the abandonment doctrine applies in the context of DNA evidence. (See, e.g., *Williamson v. State* (Md. Ct.App. 2010) 993 A.2d 626, 633–642 [admitting a DNA sample taken from a cup that suspect left on the floor of his cell while in police custody]; *Commonwealth v. Perkins* (Mass. 2008) 883 N.E.2d 230, 239 [defendant abandoned any privacy

21

interest in cigarette butts and soda can he left behind after interview with police and that were later tested for DNA]; *State v. Athan* (Wash. 2007) 158 P.3d 27, 33–34 [defendant had no reasonable expectation of privacy in saliva he used to seal an envelope mailed to detectives in a police ruse, from which detectives obtained a DNA profile; "there is no inherent privacy interest in saliva"]; *People v. LaGuerre* (N.Y. Sup.Ct. 2006) 29 A.D.3d 820, 822 [police obtained DNA sample from piece of chewing gum the defendant voluntarily discarded during a contrived soda tasting test]; but see *State v. Reed* (N.C. App.Ct. 2007) 641 S.E.2d 320, 321–323 [defendant's Fourth Amendment rights were violated when a detective kicked the defendant's cigarette butt off his patio to a common area, where it was retrieved by another detective].)

Similar to the analysis in *Carbo*, and the supporting DNA cases, we hold that police did not conduct a warrantless "search" within the meaning of the Fourth Amendment by conducting genetic testing of Konther's DNA, which he had abandoned at two crime scenes. Thus, we uphold the ruling of the trial court which denied Konther's motion to suppress evidence.

Konther seems to concede that he voluntarily abandoned his semen when he raped Jackie in 1995 and Lucia in 1998. Therefore, under the abandonment doctrine, he had no subjective expectation of privacy in his genetic information. (See *People v. Parson, supra,* 44 Cal.4th at p. 345 ["It has long been settled . . . that a warrantless search and seizure involving abandoned property is not unlawful, because a person has no reasonable expectation of privacy in such property"].) Nonetheless, Konther argues: "Regardless of the abandonment doctrine, using modern technology to create an SNP profile reveals a vast amount of information which is entitled to Fourth Amendment protection." (Boldface omitted.) We disagree.

Konther primarily relies on two United States Supreme Court

22

cases, *Riley v. California* (2014) 573 U.S. 373 (*Riley*), and *Carpenter v. United States* (2018) 585 U.S. 296 (*Carpenter*). But both cases are distinguishable, and neither case stands for the proposition that law enforcement is restricted from using modern technology for the testing of abandoned property.

In *Riley*, the Supreme Court held in consolidated cases that generally police may not, without a warrant, search digital information on a cell phone seized from a person incident to an arrest. (*Riley*, *supra*, 573 U.S. at pp. 381–403.) In one case, police stopped a car for a traffic violation, and defendant Riley was arrested for carrying loaded firearms in his vehicle. (*Id.* at p. 378.) Police searched Riley incident to arrest and seized a cell phone from his pocket. (*Id.* at pp. 378–379.) Police twice looked through the phone and found videos and photographs linking him to an earlier shooting. (*Id.* at p. 379.) Riley moved to suppress the evidence from the warrantless searches of his phone. The trial court denied the motion, but the Supreme Court disagreed with the trial court's ruling. (*Id.* at p. 403.)

In *Riley*, the Court noted that under the Fourth Amendment, searches generally require police to get a warrant, but as an exception to the warrant requirement, the Court had long recognized that police can "'search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime.'" (*Riley*, *supra*, 573 U.S. at p. 382.) The justifications for search incident to arrest exception include officer safety, and the need to avoid the destruction of evidence by the person arrested. (*Id.* at p. 386, citing *United States v. Robinson* (1973) 414 U.S. 218 (*Robinson*).) The scope of the search incident to arrest exception included "'personal property . . . immediately associated with person of the arrestee.'" (*Riley,* at p. 384.)

However, the Court noted that modern cell phones have immense storage capacity, and therefore "differ in both a quantitative and a qualitative

23

sense from other objects that might be kept on an arrestee's person." (*Riley*, *supra*, 573 U.S. at p. 393.) The Court explained that among other things cell phone data can include a person's browsing history, revealing their "private interests and concerns." (*Id.* at pp. 395–396.) In *Riley*, the Court ultimately narrowed the scope of the search incident to arrest exception as compared to its holding in *Robinson*. The Court reasoned: "A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*. [¶] We therefore decline to extend *Robinson* to searches of data on cell phones, and hold instead that officers must generally secure a warrant before conducting such a search." (*Riley,* at p. 386.)

It is critical to note that in *Riley*, there was no dispute that during his encounter with police, Riley maintained a reasonable expectation of privacy in the information on his cell phone. Therefore, there was no dispute that the viewing of Riley's cell phone information by police was a warrantless "search" within the meaning of the Fourth Amendment. The essential issue in *Riley* was the scope of the long-standing search incident to arrest exception to the warrant requirement. (*Riley*, *supra*, 573 U.S. at p. 386.) The Supreme Court narrowed the scope of the exception and excluded cell phones from the types of property immediately associated with an arrested person that can be searched without a warrant. (*Ibid.*)

Unlike the cell phone in *Riley*, the trial court in this case found that the property at issue (Konther's semen) was voluntarily abandoned by him at the scene of two crimes. That is, Riley had a reasonable expectation of privacy in the information on his cell phone, but Konther had no reasonable expectation of privacy in his abandoned property. Thus, there was not a warrantless "search" of his semen within the meaning of the Fourth Amendment. (See *Katz, supra,* 389 U.S. at p. 350.)

Indeed, opinions filed after *Riley* have held that once a defendant voluntarily abandons his or her cell phone, particularly at a crime scene, then the defendant loses any reasonable expectations of privacy in the information on that cell phone. (See, e.g., *United States v. Small* (4th Cir. 2019) 944 F.3d 490, 503–504 [affirming denial of motion to suppress warrantless search of phone, noting that when defendant "discarded the phone, he ran the risk that complete and total strangers would come upon it"]; *State v. Brown* (S.C. 2018) 815 S.E.2d 761, 765–766 [declining to apply *Riley* in context of an abandoned phone at a crime scene]; *Edwards v. State* (Tex. App. 2016) 497 S.W.3d 147, 161 [defendant abandoned his cell phone at the scene of a robbery and therefore he had no "standing" to complain of search of its contents]; but see *United States v. Hunt* (9th Cir. 2025) 153 F.4th 858, 862 ["The record does not allow the inference that [defendant] intended to abandon the phone or its contents when he dropped it after being shot five times"].)

In *Carpenter*, police obtained a defendant's cell phone records from his wireless carrier that cataloged his movements over four months, which coincided with the locations of several robberies. (*Carpenter*, *supra*, 585 U.S. at pp. 301–302.) The Supreme Court held that the Fourth Amendment required police to obtain a search warrant to access this location information. (*Id.* at p. 316.) The Court reasoned that cell phone location records have a "unique nature" because cell phones are a ubiquitous feature of modern life that constantly report their location and tend to be within a few feet of their owners at all times. (*Id.* at p. 309.) "A person does not surrender all Fourth Amendment protection by venturing into the public sphere." (*Id.* at p. 310.) The Court noted that defendant had a "reasonable expectation of privacy in the whole of his physical movements" which his phone logged "without any affirmative act on the part of the user beyond

25

powering up." (*Id.* at pp. 313–315.) "Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data" so defendant had not voluntarily assumed the risk "of turning over a comprehensive dossier of his physical movements." (*Id.* at p. 315.)

Here, unlike the cell phone location information in *Carpenter*, Konther voluntarily abandoned his expectation of privacy in his genetic information when he intentionally committed rapes in 1995 and in 1998, and left his semen at the crime scenes. Unlike the defendant in *Carpenter*, the evidence Konther exposed to public view was not a mere consequence of his "venturing into the public sphere." (*Carpenter*, *supra*, 585 U.S. at p. 310.)

In sum, as accurately stated by the trial court, Konther has provided no case law that restricts how law enforcement "can process abandoned property." And all of the numerous cases we have found confirm that law enforcement does not violate the Fourth Amendment when they conduct a warrantless search of abandoned property for the purposes of identifying criminal suspects.

In his briefing, Konther expresses broad concerns—a parade of horribles—related to genetic DNA testing. Konther seeks to reframe the issue as "whether an individual retains a privacy interest in the vast information contained in their DNA, including sensitive health information, even when the DNA is deposited on abandoned property." But the genetic DNA testing in this case did not implicate Konther's "sensitive health information," or any other information about him beyond identifying him as a suspect in two sexual assault crimes. If such a hypothetical case comes along involving "sensitive health information," we would likely file an opinion addressing that concern; however, California courts generally "do not issue advisory opinions indicating "'what the law would be upon a hypothetical state of

26

facts.""" (*People v. Slayton* (2001) 26 Cal.4th 1076, 1084.)

Thus, to reiterate and conclude, we affirm the ruling of the trial court denying Konther's motion to suppress evidence.

*B. Admission of Other Uncharged Crimes Evidence*

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: . . . [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

Konther claims that trial court erred by admitting his statements during his secretly recorded conversations in which he admitted committing other uncharged assaults. The prosecution introduced these statements for the purpose of proving Konther's propensity to commit the charged sexual offenses. (See Evid. Code, § 1108 ["In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses" may be admissible under certain circumstances].

Konther also claims that the admission of his out-of-court statements violated the corpus delicti rule. (See *Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138 [under the "corpus delicti rule," the fact that a crime has been committed cannot be proven based solely on the extrajudicial statements of the defendant].)

The Attorney General claims Konther forfeited any evidentiary errors by not objecting on these grounds in the trial court, and Konther's counsel did not provide ineffective assistance. Alternatively, the Attorney

27

General claims that the trial court committed no evidentiary errors.

We need not resolve the merits of any of these claims. Even if we assume the court erroneously admitted the evidence now being challenged on appeal (Konther's statements to his brother regarding other uncharged assaults), we would find the evidentiary error harmless under any standard of prejudice. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

The DNA obtained from Konther, and his twin brother, matched the profile of the man's DNA who raped Jackie and Lucia. The DNA evidence was essentially conclusive (there was testimony that the probability of an error was greater than one in one trillion persons). The only dispute was whether Konther or his brother was the perpetrator. But Konther essentially admitted committing both rapes in his recorded statements to his brother. And he also stated facts that only the perpetrator would have known: Konther *knew* two attacks occurred in Lake Forrest; he *knew* that one rape involved a nine-year-old girl; and he *knew* another rape (Lucia) was in the vicinity of Darryl B.'s house.

Additionally, Konther's shoulder-length hair matched the description of the rapist provided by both Jackie and Lucia, which was in contrast to Konther's brother's shorter hair style. This evidence was further corroborated by photographs of both brothers taken near the time of the sexual assaults. And the lewd act committed against Brittney was established by her testimony and corroborated by Konther's admissions.

In sum, we find any alleged evidentiary errors harmless beyond a reasonable doubt. (See *Chapman v. California, supra,* 386 U.S. at p. 24.)

28

## III.

## DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.